Filed 4/9/26  In re C.G. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re C.G., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B347663 (Super. Ct. No. 17JV00424) (Santa Barbara County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>C.G.,<br><br>    Defendant and Appellant. | |

C.G. appeals from the juvenile court's order transferring him to criminal court.  (Welf. & Inst. Code,[1] § 707).  He contends the juvenile court abused its discretion when it found all five

---

    [1] Further unspecified statutory references are to the Welfare and Institutions Code.

criteria under section 707 weighed in favor of transfer.  We affirm.

FACTS AND PROCEDURAL HISTORY

In June 2022, Joseph Ray Lujan was murdered.  He had 18 gunshot wounds, six of which were to his head.  A.V. was shot twice in the abdomen.  According to the police report, three individuals, including C.G., went to Lujan's home armed with firearms to commit a robbery of Lujan, who was involved in illegal marijuana sales.  When A.V. suspected a robbery was occurring, she ran outside and was shot.  She witnessed the individuals shoot Lujan multiple times.  C.G. was 17 years and nine months old at the time of the incident.

In October 2023, the Santa Barbara County District Attorney's Office filed a section 602 petition alleging C.G. committed the murder of Lujan (Pen. Code, § 187, subd. (a)) and assault with a firearm against A.V. (Pen. Code, § 245, subd. (a)(2)).  As to both counts, it was further alleged C.G. personally used a firearm (Pen. Code, §§ 12022.5, subd. (a), 12022.53, subd. (b)).

In April 2025, the prosecution moved to transfer C.G. to an adult court of criminal jurisdiction.  (§ 707, subd. (a)(1).)

*Prosecution evidence*

At the contested section 707 transfer hearing, Lompoc Police Officer Gabriel Molina testified he pieced together C.G.'s whereabouts on the day of the murder from police reports, surveillance videos, cell phone records, and C.G.'s gang history.  Video footage from the day of the murder showed C.G. with four "F Street" gang members.  C.G. was "flashing gang signs" with his hands, and he had a "GLOCK-style" firearm with an extended magazine that appeared loaded.  C.G. was at the home of an

2

F Street gang member about two blocks away from Lujan's house. A compilation of videos showed the route C.G. and two of his associates took from the gang member's home to Lujan's home. A video showed one person contacting Lujan at his gate and leaving the gated area with Lujan. A.V. then leaves the home and drops to the ground. A video showed C.G. walking through the alleyway next to Lujan's home. He was "flashing" gang signs and lifting his shirt to display the firearm in his waistband.

Officer Molina testified that the F Street gang is a Sureño street gang in Lompoc and that C.G. was a registered gang member. He testified that gang members must "put in work" meaning they must commit crimes and that gangs thrive by instilling fear into the community. Subsequent to the June 2022 murder, C.G. was arrested twice as an adult for possession of a firearm and for an incident involving a hit-and-run collision where a third party observed C.G. point a firearm.

Probation officer Tiffany Phillips testified regarding C.G.'s behavior while housed at the Juvenile Justice Center (JJC). Phillips testified that there were several incident reports involving C.G., including one in which he assaulted a staff member, incidents where he was violent with other youths, and an incident where he vandalized his cell. C.G. requested rehousing in county jail. Phillips provided the reasons for why his request should be granted: (1) in C.G.'s prior experiences in county jail, he had no behavior writeups or injuries and he felt more comfortable in county jail versus JJC, (2) the programming provided at JJC could be offered in county jail, (3) county jail has more ability to assess and separate the population by age and gang affiliation, and (4) the JJC youth and staff were at risk of danger if C.G. remained because he expressed he was going to

3

assault staff if he was not rehoused in county jail. In January 2024, C.G.'s request was granted.

Thereafter, there were two instances in county jail where C.G. and another person assaulted another inmate. In the incident reports, C.G. was classified as "Maximum" which meant that he was a "repeated violent offender and/or an active gang member."

Psychologist Dr. Amy Watt testified as the prosecution's expert. Dr. Watt prepared a report in 2024 based on C.G.'s records, and another report in 2025 which included a psychological evaluation after a clinical interview with C.G. and several psychological tests. In both reports, Dr. Watt opined that C.G. should be transferred to adult criminal court. Dr. Watt found that all five criteria weighed in favor of transfer.

As to the criminal sophistication criteria, Dr. Watt considered C.G.'s long history of arrests and gang involvement dating back to when he was 13 years old. Almost all his arrests were related to gang members and gang activity. Dr. Watt observed that in the instant offense, there was "a lot of planning involved." Based on the hypothetical in which C.G. and his associates walked to Lujan's home with a firearm and lured Lujan out of his home to rob him, Dr. Watt opined those acts demonstrated criminal sophistication.

As to whether C.G. could be rehabilitated within the juvenile jurisdictional time limits, Dr. Watt opined that there was "very limited rehabilitation potential" for C.G. She noted that since October 2023 when he was placed in custody, C.G. had multiple incidents and altercations in JJC and adult jail and that most of these altercations were gang related. Dr. Watt acknowledged his participation in programs, but he had no

4

insight into future plans and had no community support. If he were released, she believed he would go back to his gang because they were the "only people that he experiences acceptance and recognition because of his horrific family history and feeling abandoned and rejected by his family throughout his life." Additionally, Dr. Watt observed that C.G. engaged in "deceitful and manipulative" behavior to achieve his purpose. Dr. Watt observed that C.G. would appear confused during his interview to achieve his purpose, but there was a "stark difference" from all other descriptions of him in the record. C.G. also exhibited no regret or remorse, which reflected his lack of intent to change.

Dr. Watt reviewed defense expert Dr. Carolyn Murphy's report. Dr. Watt indicated C.G. may have an antisocial personality disorder. She explained the treatment for antisocial personality disorders is intensive mental health treatment and that "it takes longer for treatment to be effective." She opined, "I cannot say if mental health treatment would be effective with [C.G.] because he has routinely refused mental health treatment or counseling." During testing including psychological, personality, cognitive, and emotional functioning testing, C.G. appeared confused, but Dr. Watt observed he presented differently and there was no confusion in other instances such as when he spoke to his girlfriend over the phone. Similarly, C.G.'s I.Q. measured low, but this result was inconsistent with Dr. Watt's personal observations and there was no evidence to support a diagnosis of intellectual disability. Dr. Watt believed his test results were due to poor effort or lack of cooperation.

As to C.G.'s previous delinquent history, Dr. Watt discussed his history of arrests starting when he was arrested for vehicle theft at 13 years old and escalating to gang violence and

5

firearm offenses. He was often arrested with gang members and gang activities.

As to prior attempts to rehabilitate, Dr. Watt noted that previous attempts were unsuccessful as he continued to commit offenses and was arrested right before the instant offense. Dr. Watt further noted that after he finished juvenile probation, he was arrested as an adult more than once. Based on her review of incident reports from JJC and county jail, C.G. was the aggressor in a majority of incidents.

As to the circumstances and gravity of the offense, C.G was 17 years and nine months old at the time of the offense. Dr. Watt observed that C.G.'s behavioral patterns have been ongoing since he was 13 years old. Dr. Watt did not believe C.G. could be rehabilitated in the juvenile system within the jurisdictional time limits.

Probation officer Victoria Kral wrote the transfer reports recommending that C.G. be transferred to adult criminal court. As to criminal sophistication, Kral considered C.G.'s intellectual capacity and noted that he took many programs in jail and has the capacity to finish school. Kral testified C.G. had social adaptive behavior issues involving following rules, problem solving, and respecting the law. She was not aware of any intellectual or developmental disabilities. Regarding C.G.'s physical and mental health, Kral noted that C.G.'s mother used drugs while pregnant, but there was no diagnosis regarding how it currently affected him. Kral also noted C.G. had a "poly-substance disorder." With respect to impetuosity or failure to appreciate the risks and consequences of criminal behavior, Kral noted C.G. was an F Street gang member and that he had repeatedly been exposed to violence. With respect to his family

6

environment and upbringing, Kral further noted that C.G.'s parents neglected him. He alleged he was physically and emotionally abused by his stepmother and grandmother. Based on a hypothetical reflecting the alleged facts of this offense, Kral opined that C.G. was "transferable."

Kral believed C.G. could not be rehabilitated before the expiration of the juvenile court's jurisdiction. She also believed his previous delinquent behavior also supported transfer. C.G. was referred to probation when he was 13 years old for unlawful sexual intercourse and thereafter for petty theft. He was then declared a ward in 2017 for evading a police officer in a vehicle, twice in 2018 for unlawful driving or taking of a vehicle and resisting arrest, and in 2019 for carrying a loaded firearm in public—all offenses involving other F Street gang members. C.G. also had two adjudicated probation violations, including an instance where he absconded from camp. After the instant offense, he was convicted twice as an adult for firearm offenses. From the last interview, C.G. was not getting any mental health services in jail. Kral believed this factor supported transfer because C.G. continued to commit crimes with firearms and other gang members despite receiving programming, completing a camp commitment, and living in another state.

Regarding previous attempts to rehabilitate C.G., Kral listed services C.G. had received through juvenile and adult probation and camp commitment. Kral believed prior efforts by the juvenile court to rehabilitate "have been exhausted."

As to the circumstances and gravity of the offense, Kral noted the level of harm that was caused; Lujan lost his life, and A.V. could have lost hers. Kral testified regarding instances in custody where C.G. engaged in fights with other gang members,

7

threatened staff members with violence, and continued to engage in acts showing his allegiance to his gang.

Kral testified that C.G. did not do well in juvenile hall, and towards the end, he was doing everything he could to get transferred to jail including assaulting other youth and staff. Kral testified that C.G. continued to associate with the F Street gang while at JJC through 2024 and that he continued to be violent in custody. Probation recommended transfer to adult court as there was insufficient time to rehabilitate C.G. in the juvenile court's jurisdiction.

*Defense evidence*

Martín Flores testified as a defense gang expert. He interviewed C.G. and discussed his family background. C.G. said his mother was no longer in his life because of her own mental health and drug issues and that all of her children were removed from her custody. C.G.'s father was in and out of custody and had drug issues, but nevertheless gained custody over C.G. There were reports of potential physical abuse by his father. C.G.'s stepmother treated him like an "abandoned stepchild" and differently from her own children. C.G. lived in extreme poverty without family or support, and such circumstances heightened his risk of joining a gang. Flores opined that C.G. would have a better chance of putting gang life behind him if he remained in the juvenile court's jurisdiction and took advantage of services. Flores believed that C.G. was taking steps to change because he began taking advantage of resources and programs. C.G. also told probation and Flores that he was no longer an F Street gang member. Flores believed C.G. was amenable to rehabilitation in

8

the juvenile court jurisdiction and that there was sufficient time (more than four years) for him to rehabilitate.

Psychologist Dr. Murphy testified as a defense expert. Murphy interviewed and evaluated C.G. for transfer. Dr. Murphy reviewed C.G.'s family history and noted that his mother used drugs while pregnant, but he did not test positive for drugs at birth. C.G. was placed in foster care at birth and was removed from her custody. His stepmother was the dominant parental figure in his life. He perceived his stepmother preferred her own children to him, and there was a lot of anger and resentment from the way she treated him. C.G. began using alcohol and cannabis at an early age. Dr. Murphy opined that such use affected his development.

From her evaluation, Dr. Murphy diagnosed C.G. with conduct disorder and was also concerned about his cannabis use. She explained that conduct disorder is when an individual has behavior disturbance in at least three areas of functioning; the general categories are truancy, assaults, property destruction, fire-setting, and theft.

As to the section 707 criteria, Dr. Murphy testified that when it came to degree of criminal sophistication, she agreed with Dr. Watt that C.G. was not intellectually delayed. In considering C.G.'s intellectual capacity, Dr. Murphy mentioned that C.G. reported a probable concussion incident, probable drug exposure in utero, and some impulsivity and immature decision-making, but he was not disabled. When considering the impact of his family, she opined that both biological family and gang family were "critical in his development of a lot of attitudes and beliefs that are conduct disorder. They're not pro-social." Dr. Murphy testified that C.G. experienced "adverse childhood events"

including parental criminality, household substance use, parents with mental health issues, and divorce. He also experienced "[a]dverse community events," including poverty and growing up in a "criminogenic" neighborhood where violence and stealing are normalized. Dr. Murphy had mental health concerns regarding C.G. including conduct disorder, anger management, and emotional dysregulation. She also opined that due to trauma, his age, and cannabis use, C.G. was impulsive, had poor decision-making, and lacked appreciation for risks and consequences.

Regarding C.G.'s prior delinquent history, Dr. Murphy opined that one could expect to have some continued behavioral problems and difficulty pulling away from a gang when a person is still young and in an environment with other people of similar backgrounds. Acting out should be considered in the context of a person's level of trauma and dysfunction. With respect to C.G.'s noncompliance with treatment, Dr. Murphy noted that his parents contributed by refusing to take him to necessary assessment when he was a minor.

Dr. Murphy opined that psychologists cannot weigh in on the circumstances and gravity of the offense because there was no psychological test or process to do so. She opined that C.G.'s behavior was attributed to his background, which included his exposure to drugs at birth, his relationship with his parents, the modeling of drug use and criminality and being homeless, and his relationship to his gang affects his behavior. She opined that C.G. was amenable to rehabilitation.

### Transfer order

At the conclusion of the hearing, the juvenile court granted the motion and ordered C.G. transferred to adult criminal court. It found all five criteria under section 707 weighed in favor of

10

transfer. Based on the five criteria and totality of the evidence, the court found the People met their burden to show by clear and convincing evidence that C.G. was not amenable to rehabilitation while under the juvenile court's jurisdiction.

## DISCUSSION

C.G. contends the juvenile court erred in evaluating three of the criteria under section 707—the degree of criminal sophistication, previous delinquent history, and the gravity and circumstances of the offense. We conclude there was no error.

Section 707, subdivision (a)(3) provides that in order to "find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court."

In making its decision, the court shall consider the following five criteria: (A) "The degree of criminal sophistication exhibited by the minor"; (B) "Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (C) "The minor's previous delinquent history"; (D) "Success of previous attempts by the juvenile court to rehabilitate the minor"; and (E) "The circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(A)–(E).)

"If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).)

The minor's amenability to rehabilitation under the juvenile court's jurisdiction is "the ultimate question for the court

to decide." (*In re E.P.* (2023) 89 Cal.App.5th 409, 416.) In deciding that question, the juvenile court shall analyze the five criteria set forth in section 707, subdivision (a)(3) "focused through the lens of amenability to rehabilitation." (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1288 (*S.S.*), superseded by statute on other grounds as stated in *In re J.M.* (2024) 103 Cal.App.5th 745, 751–753; *E.P.*, at p. 416.)

We review the juvenile court's order transferring a case to an adult court of criminal jurisdiction for abuse of discretion. (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 680.) The juvenile court's findings as to the five fitness criteria under section 707, subdivision (a)(3)(A) through (E) are factual findings that we review for substantial evidence. (*Jones*, at p. 681.) The substantial evidence standard is deferential, and we review the record most favorably to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof. (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 165; *In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) We give due deference to how the trier of fact evaluated the credibility of witnesses, resolved conflicts in the evidence, and drew reasonable inferences from the evidence. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

On appeal, C.G. contests the criminal sophistication, prior delinquent history, and the circumstances and gravity of the alleged offense criteria. He does not contest the juvenile court's findings as to criteria pertaining to whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction and the previous attempts to rehabilitate C.G. We

12

therefore address only the three criteria directly challenged on appeal.

### 1. *Criminal sophistication*

When evaluating the degree of criminal sophistication exhibited by a minor, the juvenile court "shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (§ 707, subd. (a)(3)(A)(ii).)

Substantial evidence supports the juvenile court's finding that the degree of criminal sophistication weighed in favor of transfer. C.G. was three months shy of being 18 years old at the time of the offense. He was not intellectually disabled. Probation officer Kral testified that C.G. took many programs in jail and had the capacity to finish school. Furthermore, as the court observed, C.G. showed the capacity to "support himself in relative normalcy by securing a job while out of state in 2022 and establishing and maintaining a household for a brief period of time." The circumstances of the crime also reflect a level of intellectual and mental capacity to engage in a deliberate and planned criminal activity. (See *In re J.S.* (2024) 105 Cal.App.5th 205, 214 [planning ahead to commit a crime is indicative of criminal sophistication].) As Dr. Watt observed, there was "a lot

13

of planning involved" in the offense. He and two gang associates planned an armed robbery of Lujan, lured him out of the house, and shot him and A.V. multiple times. C.G. also had a history of criminal activities and gang involvement, which began when he was 13 years old and almost all his previous arrests were gang related. C.G. "flashed" gang signs before and during the commission of the offense, indicating that, like his previous offenses, the offense was gang related. As the trial court observed, such facts reflect that his actions were not "the result of impetuosity" but rather demonstrate "criminal sophistication in planning a robbery, with the unfortunate but foreseeable result" of murder and violence.

C.G. contends the juvenile court failed to consider the effect of his family and community environment on this criterion and erred in finding that he did not suffer from "any notable mental health or . . . emotional issues." But the record does not reflect the juvenile court ignored such evidence. Here, the court cited to the factors it was required to consider under section 707, subdivision (a)(3)(A), including the minor's "physical, mental, and emotional health at the time of the alleged offense," "the effect of the minor's family and community environment," and "the existence of childhood trauma." We presume the juvenile court followed the applicable law, and such presumption will only be overcome by an affirmative showing of error in the record. (*People v. Nakano* (2023) 89 Cal.App.5th 623, 635.) C.G. makes no such affirmative showing of error. The record neither shows the juvenile court failed to evaluate any relevant factors, nor does it show the court ignored the abundant evidence regarding C.G.'s family and community environment, childhood trauma, or mental and emotional health. Rather, the juvenile court expressly stated

14

it considered all written and oral arguments, the testimony of all witnesses including defense witnesses, and all exhibits received into evidence.

The court's review necessarily included evidence of C.G.'s childhood trauma, the effect of his family and community environment, and his mental and emotional health. (*In re J.S.*, *supra*, 105 Cal.App.5th at p. 214.) The court also expressly acknowledged C.G.'s childhood trauma, which it found "significant" but did not "attribute much weight to this factor" when weighed against other factors unfavorable to C.G. This finding is further supported by the testimony of Dr. Watt, who psychologically evaluated C.G. and acknowledged his childhood trauma, but nonetheless found the degree of criminal sophistication criteria weighed in favor of transfer.

We also conclude the court did not err in finding that C.G. did not currently or at the time of the offense suffer "any notable mental health or . . . emotional issues." We do not read this statement as the juvenile court's failure to properly evaluate his mental health; rather we interpret it to mean that in considering the evidence of C.G.'s mental health or emotional issues, the court found it did not negate the degree of criminal sophistication C.G. had exhibited. We give deference to how the juvenile court weighed the evidence. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.)

C.G. further contends that the juvenile court made "no mention" of family and community environment in its ruling, and its failure to do so means it ignored such factors. We disagree because the court discussed C.G.'s gang relations and family trauma. But in any event, we do not equate the court's omission of specific mention of a factor with its failure to evaluate it.

15

Section 707, subdivision (a)(3) requires the court to "recite the basis for its decision, . . . which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." The juvenile court adequately did so here.

### 2. Previous delinquent history

When evaluating the minor's previous delinquent history, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(3)(C)(ii).)

Substantial evidence supports the juvenile court's finding that C.G.'s previous delinquent history weighed in favor of transfer. C.G.'s had a lengthy delinquent history, which began when he was 13 years old. The probation supplemental transfer report provides a summary of his offenses as a minor including unlawful driving or taking a vehicle, evading an officer, resisting arrest, and carrying a loaded firearm. He violated probation multiple times, including absconding from camp. After committing the instant offense, he was convicted as an adult of two firearm offenses. He also was convicted of two counts of resisting an executive officer, which involved the assault of two JJC officers.

As the trial court observed, C.G.'s unlawful activity "has been relatively unabated since he was 13 years old despite the programming he received while under the jurisdiction of the juvenile court." Moreover, the incident reports from JJC and county jail and Kral's testimony reflect that C.G. continued to act violently, including assaulting other youths, inmates, and staff

16

with C.G. being the aggressor in many instances.  (*D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 453 [conduct occurring after the alleged offense was relevant to evaluating the minor's delinquent history].)

C.G. does not contest his previous delinquent history, but he contends the juvenile court once again ignored evidence regarding the effect of his family and community environment and childhood trauma.  We disagree.  The juvenile court acknowledged he "suffered childhood trauma" but found "there is no evidence to indicate that this unlawful behavior is mitigated by this factor."  As we discussed in relation to the criminal sophistication criterion, the court was aware of C.G.'s family and community environment and childhood trauma.  Such evidence was presented at the transfer hearing and set forth in detail in the transfer report.  We presume the court properly weighed all relevant factors both favorable and unfavorable to C.G. when evaluating his previous delinquent history.  (See *In re Julian R.* (2009) 47 Cal.4th 487, 499.)

C.G. also contends the juvenile court's statement that there was "no evidence to indicate that this unlawful behavior is mitigated" by his childhood trauma indicates the court overlooked or ignored evidence of his childhood trauma.  We do not read that statement as the court ignoring evidence.  The court was entitled to and was in the best position to determine whether the evidence of C.G.'s childhood trauma *mitigated* or negated his unlawful behavior.  It found that it did not, and we defer to the court's weighing of evidence.  (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.)

17

### 3. *Circumstances and gravity of the alleged offense*

When evaluating the circumstances and gravity of the alleged offenses, the juvenile court "shall give weight to any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." (§ 707, subd. (a)(3)(E)(ii).)

Substantial evidence supports the juvenile court's finding that the circumstances and gravity of the instant offense weighed in favor of transfer. The harm here was "the most serious and grave harm possible." Lujan lost his life. He had 18 gunshot wounds, six of which were to his head. A.V. had two gunshot wounds to the abdomen and was critically injured. The robbery was planned and deliberate, and C.G. and his associates were all armed. C.G. was "flashing" gang signs before and during the commission of the offense, reflecting allegiance to his gang. His allegiance to his gang was a consistent theme, as reflected with his prior offenses and with his continued behaviors in JJC and county jail. Dr. Watt testified he showed no remorse or regret for his actions.

C.G. contends the juvenile court ignored evidence that his mental and emotional development played a significant role in the commission of the offense. We again disagree. The juvenile court here noted that there was some evidence of sexual abuse, but "no evidence was presented that this abuse, nor the youth's mental and emotional development was a significant factor in the commission of this crime." The court's finding is proper. The court considered all of the evidence of C.G.'s mental and emotional health and development including evidence regarding

18

his polysubstance disorder, conduct disorder, and potential antisocial personality disorder.  But, in weighing such evidence, the court found it was not a significant role in the commission of the offense and did not negate the gravity of the offense.

Because substantial evidence supports all three of the contested criteria and C.G. does not otherwise show error, the juvenile court did not abuse its discretion in ordering C.G. to be transferred to adult criminal court jurisdiction.[2]

DISPOSITION

The transfer order pursuant to section 707 is affirmed.

NOT TO BE PUBLISHED.


BALTODANO, J.


We concur:


YEGAN, Acting P. J.


CODY, J.

---

[2] Because we address the merits of C.G.'s contentions, we need not determine whether C.G.'s claims were forfeited.

19

Gustavo E. Lavayen, Judge

Superior Court County of Santa Barbara

_____

Kristen Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.